ECF CASE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x

PETER ESSER,

               Plaintiff,

-against-

RAINBOW ADVERTISING SALES CORP.
d/b/a CABLEVISION ADVERTISING
SALES,

               Defendant.

----------------------------------x

FILED
U.S. DISTRICT COURT
2005 APR 11  P 3: 26
S.D. OF N.Y. W.P.

**05 CIV. 3703**

COMPLAINT
WITH JURY DEMAND

JUDGE CONNER

Plaintiff, **PETER ESSER**, by his attorneys, **SAPIR & FRUMKIN LLP**, as and for his Complaint against defendant, **RAINBOW ADVERTISING SALES CORP. d/b/a CABLEVISION ADVERTISING SALES** ("Cablevision Advertising") alleges as follows:

### I. NATURE OF THE CLAIMS

1. This is an action for damages and injunctive and declaratory relief caused by a) defendant's interference of Mr. Esser's exercise of his rights under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2614, by terminating Mr. Esser during his protected medical leave of absence and failing to restore Mr. Esser to his position or an equivalent position following his protected medical leave of absence, in violation of Section 102 of the FMLA, 29 U.S.C. § 2615 and, b) defendant's retaliatory discharge of Mr. Esser in violation of the FMLA, 29 U.S.C. § 2615.

### II. JURISDICTION AND VENUE

2. Jurisdiction of this Court to adjudicate plaintiffs' first and second claims is invoked pursuant to 28 U.S.C. § 1331 this being a suit authorized and instituted pursuant to FMLA, 29 U.S.C. § 2617.

USDC SDNY
DOCUMENT
ELECTRONICALLY F
DOC #: _____
DATE FILED: _____

3. This Court is one of proper venue because Defendant has contacts with the Southern District of New York sufficient to subject it to personal jurisdiction if the Southern District of New York were a separate State. Accordingly, venue lies in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) and (c).

### III. PARTIES

4. Plaintiff Peter Esser is a male citizen of the United States and a resident of the County of Westchester in the State of New York. Plaintiff was employed as an Account Executive by defendant Cablevision Advertising from January of 1998 until July 26, 2004. Having been employed for at least 12 months by Cablevision Advertising and having been employed by Cablevision Advertising for at least 1250 hours of service during the previous 12 month period, Mr. Esser was an "eligible employee" of defendant within the meaning of 29 U.S.C. § 2611(2)(A) at the time he requested of defendant a leave of absence from employment.

5. Upon information and belief, defendant Cablevision Advertising is a subsidiary of Cablevision Systems Corporation, one of the nation's leading telecommunications and entertainment corporations serving the New York metropolitan area. Cablevision Advertising is an advertising representation firm and maintains an office located at 1111 Stewart Avenue, Bethpage, New York 11714. Defendant was the "employer" of plaintiff within the meaning of 29 U.S.C. § 2611(4)(A) at all times relevant to this action in that Cablevision Advertising was engaged in commerce or in an industry or activity affecting commerce and employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year.

### IV. FACTS UNDERLYING PLAINTIFF'S CLAIMS

6. Mr. Esser was a conscientious and dependable employee for Cablevision Advertising

for approximately six and a half years. Mr. Esser was hired by Cablevision Advertising in January of 1998 and brought to the company a B.A. in communications and thirteen years of experience working in television and sales, including cable sales. Mr. Esser was qualified for his position.

7. Mr. Esser's job duties as an Account Executive included selling television advertising time to local businesses. The business' advertisements were then broadcasted on prominent stations including, but not limited to, CNBC, CNN, A&E, Lifetime, Women's Entertainment, and Discovery. Mr. Esser's job duties involved administrative tasks such as typing and writing that required the use of his hands and wrists.

8. In December 2003, Mr. Esser was diagnosed with carpal tunnel syndrome and his doctor recommended surgery to relieve the pressure in both of his wrists.

9. In May 2004, Mr. Esser requested FMLA leave for the surgeries and recovery. Mr. Esser was entitled to take said leave because his condition and subsequent medical treatment was a "serious health condition" within the meaning of 29 U.S.C. § 2611(11), as he suffered from an illness, injury, impairment, or physical condition that involved outpatient care in a hospital and continuing treatment by a health care provider.

10. In May 2004, Cablevision Advertising approved Mr. Esser's request for FMLA leave for the surgeries and recovery. Mr. Esser was approved for protected medical leave pursuant to FMLA for the period June 7, 2004 until September 7, 2004.

11. On June 9, 2004, Mr. Esser underwent surgery on his left wrist. He then spent six weeks recovering before the surgery on his right wrist, which was scheduled for July 21, 2004. During this time, Mr. Esser was unable to use his left hand and relied on his wife for transportation and assistance.

3

12. On July 16, 2004, at the end of the recovery period for his left wrist, and a few days before the surgery scheduled for his right wrist, Mr. Esser attended an Elton John concert with a friend at Radio City Music Hall ("Radio City").

13. As a Cablevision Advertising employee, Mr. Esser had often attended events with his wife at Madison Square Garden ("MSG"), which is owned by Cablevision. Following the practice of other Cablevision employees, Mr. Esser would show his Cablevision identification to MSG security guards and pass through a special entrance, which did not require waiting in line.

14. MSG security guards also allowed Mr. Esser to bring his wife, who is not a Cablevision employee, through the restricted entrance.

15. Although Mr. Esser had not attended a show at Radio City as a Cablevision employee, he believed the same procedure applied, as Radio City, like MSG, is owned by Cablevision.

16. On the night of the Elton John concert, Mr. Esser showed his Cablevision identification to a Radio City security guard and was allowed to pass through a separate entrance that did not require waiting in line. However, the security guard stated that Mr. Esser could not bring his friend through the separate entrance, as the friend was not a Cablevision employee. Mr. Esser's friend was a contracted consultant for Clear Channel Communications and had obtained tickets for the concert through that company. As a result, when Mr. Esser entered the restricted area, he got into the elevator, exited on the floor with Clear Channel's offices, and asked a Clear Channel employee whether he could obtain approval for his friend to pass through the same entrance. When Clear Channel denied the request, Mr. Esser returned to the security area and informed his friend that they would have to meet at their seats. Mr. Esser then showed his Cablevision identification to the same Radio City security guard, used the restroom, and went directly to his seat.

17. Later that evening, Mr. Esser was unable to find his validated parking permit. Mr. Esser approached the same security guard who, earlier that evening, had twice allowed him to enter the restricted area at Radio City. The security guard called over a second guard who asked for Mr. Esser's Cablevision identification and ticket. Mr. Esser gave the security guard the documents, along with his business card. The security guard left for a short time and then returned Mr. Esser's identification and ticket. However, the security guard never explained what had happened or why Mr. Esser's identification was required. Thereafter, Mr. Esser found his parking permit and left Radio City.

18. On July 19, 2004, John Oleynick, Vice President of Local Advertising Sales at Cablevision Advertising, called Mr. Esser at home and asked him to explain what had happened on the night of the concert. Mr. Esser explained the events of that evening, exactly as set forth above. Mr. Esser also informed Mr. Oleynick that his left wrist had healed and he would be having surgery on his right wrist that Wednesday.

19. On July 26, 2004, only a few days after the second surgery, Mr. Esser was required to have emergency dental surgery. When he returned, Mr. Oleynick had left a voice mail message directing Mr. Esser to call him. After leaving the message, Mr. Oleynick neglected to hang up the phone and began a conversation with Elena Ferraro, a Cablevision Employee Relations Representative. In a snide tone, Mr. Oleynick stated: "For a guy that is supposedly so hurt, it is interesting that he is not home."

20. Mr. Esser spoke with Mr. Oleynick and Ms. Ferraro later that day. Mr. Esser informed Mr. Oleynick and Ms. Ferraro that he had been at the dentist's office when they had left

5

the voice mail message earlier that day and Ms. Ferraro nervously responded that, in the voice mail message, he and Ms. Ferraro had been talking about someone else.

21. Mr. Oleynick stated that, based on information reported to Cablevision Advertising from Radio City, a decision had been made to terminate Mr. Esser's employment.

22. Despite Mr. Esser's repeated requests, Mr. Oleynick and Ms. Ferraro refused to provide any additional information about the termination or who had made the decision. Specifically, Mr. Oleynick refused to explain the "information" that had been reported from Radio City or what Mr. Esser had allegedly done wrong on the night of the concert.

23. Mr. Esser was later informed by the New York State Department of Labor that he was denied unemployment benefits, because Cablevision Advertising alleged that he committed gross misconduct.

24. Upon information and belief, Cablevision Advertising's proffered reason for Mr. Esser's termination was that Mr. Esser allegedly trespassed into a highly restricted area and breached security while attending the concert at Radio City.

25. Cablevision Advertising's stated reason for Mr. Esser's discharge is a pretext. The true reason Mr. Esser was terminated was because he exercised his rights under FMLA to take protected medical leave.

26. Notwithstanding Cablevision Advertising's approval of Mr. Esser's request for protected FMLA leave for the period June 7, 2004 until September 7, 2004, Mr. Esser was unlawfully terminated during his protected medical leave on July 26, 2004, approximately one and a half months before his protected FMLA leave would have expired. Cablevision Advertising's conduct constitutes unlawful interference with Mr. Esser's rights to take FMLA leave and to return to his position or an equivalent position following his protected medical leave.

27.     Further, Cablevision Advertising's conduct constitutes unlawful retaliation for Mr. Esser's exercise of his rights under FMLA to take protected medical leave.

## V. AS AND FOR PLAINTIFFS' FIRST CLAIM

### *Interference/Violation of the FMLA*

28.     Plaintiffs repeat and reallege paragraphs "1" through "27" as though fully set forth herein.

29.     Defendant's conduct described in paragraphs "6" through "27" has interfered with Plaintiff's right to take protected FMLA leave and his entitlement to be restored to the same or an equivalent position as the position he had held prior to his leave, upon his return to work following his absence.

30.     Defendant's conduct described in paragraphs "6" through "27" violates the prohibition against interference with, restraint, or denial of the exercise of or the attempt to exercise plaintiff's rights contained in the FMLA as set forth in 29 U.S.C.§ 2615(a)(1).

31.     Upon information and belief, the violation by defendant Cablevision Advertising was willful and not in good faith, and plaintiff is therefore entitled to liquidated damages.

32.     As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer damages, including but not limited to lost wages and benefits, interest, and reasonable attorney's fees and costs.

## VI. AS AND FOR PLAINTIFFS' SECOND CLAIM

### *Retaliation/Violation of the FMLA*

33.     Plaintiffs repeat and reallege paragraphs "1" through "27" as though fully set forth herein.

34.     Defendant's conduct described in paragraphs "6" through "27" violates the anti-retaliation provision of FMLA set forth in 29 U.S.C.§ 2615(a)(1).

35.     Upon information and belief, the violation by defendant Cablevision Advertising was willful and not in good faith, and plaintiff is therefore entitled to liquidated damages.

36.     As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer damages, including but not limited to lost wages and benefits, interest, and reasonable attorney's fees and costs.

## VII. **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests:

1.     That the Court declare defendant's conduct complained of herein to be in violation of the Plaintiffs' rights as secured by the FMLA;

2.     That the Court permanently enjoin defendant, all of its subsidiaries, divisions and affiliated entities, its officers, managers, employees, agents successors and assigns from any conduct violating Plaintiff's rights as secured by the FMLA;

3.     Award Plaintiff the following damages:

### ON ALL CLAIMS

4.     Damages in the amount of any wages, salary, employment benefits, or other compensation denied or lost to Mr. Esser by reason of the violation;

5.     Interest on the amount described above calculated at the prevailing rate;

6.     Liquidated damages equal to the sum of the amount described in paragraphs 4 and 5 above;

7.     Reasonable attorney's fees incurred in prosecuting this action;

8.     That the Court grant Plaintiffs such other and further relief as it deems just and proper.

## VIII. JURY DEMAND

Plaintiffs demand a trial by jury with respect to all issues and claims properly triable before a jury.

Dated: White Plains, New York
       April 11, 2005

Yours, etc.,

**SAPIR & FRUMKIN LLP**

By: _____
William D. Frumkin, Esq. (WF 2173)
Attorneys for Plaintiff
399 Knollwood Road, Suite 310
White Plains, New York 10603
(914) 328-0366

F:\APPLICAT\WP\Esser\COMPLAINt.wpd\rlh\dp