UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ECF Case

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

PETER ESSER,

                Plaintiff,

Civil Action No.05-3703 (WCC)

      -against-

RAINBOW ADVERTISING SALES CORP.
d/b/a CABLEVISION ADVERTISING
SALES,

**PLAINTIFF'S STATEMENT
PURSUANT TO LOCAL RULE
56.1(b)**

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Pursuant to Local Rule 56.1(b), Plaintiff respectfully submits the following Statement of

Material Facts as to Which There Exist Genuine Issues to Be Tried.

### *FACTS AS TO WHICH THERE EXIST GENUINE ISSUES TO BE TRIED*

1.     Plaintiff, Peter Esser was employed by Rainbow Advertising Sales Corporation

(hereinafter, "RASCO" or "company" or "Defendant") from January 1998 until his unlawful

termination on July 26, 2004. (Affidavit of Peter Esser in Opposition to Defendant's Summary

Judgment Motion (hereinafter, "Esser Aff.") at ¶ 2.

2.     In 2004, Plaintiff's title was Account Executive and his job duties included selling

advertisements for local cable television stations. (*Id.* at ¶ 3).

3.     Plaintiff was approved for FMLA leave by RASCO. Mr. Esser's medical leave was

necessitated by a diagnosis of Carpal Tunnel Syndrome ("CTS"). As a result of the CTS, Plaintiff

had consecutive surgeries on each wrist. (*Id.* at ¶ ¶ 4-5).

4.     Plaintiff was approved for twelve weeks of FMLA leave which was to run from June

12, 2004 through September 4, 2004. (Frumkin Decl.,[1] Ex. N).

---

[1]References to "Frumkin Decl. Ex. _" are to the Declaration of William D. Frumkin in
Opposition to Defendant's Motion for Summary Judgment. All references to Exhibits
hereinafter are to exhibits attached to the Frumkin Decl.

5.　　Prior to going out on approved FMLA leave, on May 10, 2004, Plaintiff was evaluated by his supervisor, Greg McNally, and placed on an extended thirty (30) day "Recovery Plan" because he had not met sales objectives set by the company. (Ex. E at 54:12-55:17).

6.　　Under the Recovery Plan, Plaintiff had thirty days to improve his sales performance. The thirty day Recovery Plan was scheduled to overlap with Plaintiff's FMLA leave. (Ex. D at 74:3-18).

7.　　Plaintiff was concerned that his absence due to taking FMLA leave would count against the time he had to improve his sales performance under the Recovery Plan. (*Id.* at 73:6-19); (Ex. E at 61:9-25); (Esser Aff. at ¶¶ 6-7).

8.　　Plaintiff outlined his concerns about FMLA leave and the Recovery Plan in an employee comment section of his performance evaluation- "Section G." (Ex. D at 59:6-60:3; 78:24-79:18 ); (Esser Aff. at ¶ 8); (Ex. Z).

9.　　John Oleynick, Vice President of Sales for RASCO was "irritated" that Plaintiff prepared the comments outlined in Section G of his performance evaluation. (Ex. D at 78:24-79:18).

10.　　Mr. Oleynick scheduled a meeting with Plaintiff to discuss Section G of Plaintiff's performance evaluation and his FMLA leave. The meeting took place on May 27, 2004. (Ex. C at 231-246); (Esser Aff. at ¶9).

11.　　During the meeting, Mr. Oleynick told Plaintiff that the time he was out on FMLA leave would not factor into the thirty day "Recovery Plan" time frame for Plaintiff's sales performance to improve. (Ex. D at 76:24-77:10);(Esser Aff. at ¶10).

12.     At the end of the meeting, Oleynick outwardly exhibited his feelings of irritation towards Plaintiff by refusing to shake Plaintiff's hand.(Esser Aff. at ¶11);(Ex. C at 231-248);(Ex. D at 85:16-86:11).  During deposition, Oleynick claimed that he didn't shake Plaintiff's hand because of Plaintiff's Carpal Tunnel Syndrome diagnosis, however, Plaintiff's condition did not prevent him from shaking hands, Plaintiff was not wearing any splint or other type of brace indicating he could not shake hands, and Plaintiff offered Oleynick his hand to shake.(Esser Aff. at ¶11);(Ex. D at 85:16-86:11);(Ex. C at 244:4-248:4).

13.     On July 16, 2004, in between surgeries, while out on FMLA leave, Plaintiff attended an Elton John concert at Radio City Music Hall ("RCMH") with his friend, Brad Joblin. (Esser Aff. at ¶12).

14.     Plaintiff, as a RASCO/Cablevision employee was entitled to discounted parking at RCMH, a Cablevision owned facility. (Esser Aff. at ¶13);(Ex. H at107:23-108:25);(Ex.AA). Pursuant to company procedures, Plaintiff had his parking ticket validated at the employee entrance, or the Stage Door entrance to RCMH located at 51st Street. (Esser Aff. at ¶13);(Ex. C at 46-47); (Ex. M at 37:14-38:5).

15.     Harold Marin was the only RCMH security officer/Stage Door Attendant assigned to the Stage Door on the night of the Elton John concert. (Ex. M at 20:10-21:9).

16.     Plaintiff asked Security Officer Marin if he and his friend could enter RCMH through the Stage Door entrance.(Esser Aff. at ¶14).

17.     Security Officer Marin gave permission for Plaintiff to enter RCMH through the Stage Door entrance, however, Plaintiff's friend was not permitted to enter through the same entrance because he was not a Cablevision employee.  (Esser Aff. at ¶¶14-15).

3

18.     Since Plaintiff's friend was affiliated with Clear Channel Communications ("Clear Channel"), a company with offices located within RCMH, Plaintiff asked the security guard if he could go to Clear Channel's offices to speak with someone in an attempt to obtain clearance for Brad Joblin to enter RCMH through the Stage Door entrance. (Esser Aff. at ¶16). The guard allowed Plaintiff to do so. (*Id.*)

19.     Plaintiff did not know how to get to Clear Channel's offices and the security guard did not give Plaintiff directions. (Esser Aff. at ¶17). Security Officer Harold Marin testified that he did not know where Clear Channel's offices were located on the night of the Elton John concert. (Ex. M at 48:7-49:7).

20.     The security guard did not inform Plaintiff that he was not allowed to go to certain floors within RCMH. The security guard did not inform Plaintiff that any particular floor of RCMH was a restricted area of RCMH because of the concert. (Esser Aff. at ¶18). The security guard simply let Plaintiff inside without instruction. (Esser Aff. at ¶¶18-19).

21.     Unbeknownst to Plaintiff, the security guard did not follow security procedures in allowing Plaintiff access to RCMH through the Stage Door entrance. (Ex. H at 93:23-94:10).

22.     For example, the security guard did not contact anyone at Clear Channel in order to alert that them Plaintiff would be arriving. (Ex. M at 44:10-45:6). Further, the security guard did not physically give Plaintiff the proper security pass required for any individual who entered RCMH through the Stage Door entrance on the evening of the concert. (Ex. M at 49:13-24; 51:8-52:16); (Ex. H at 93:23-94:10); (Esser Aff. at ¶ 20).

23.     Security Officer Marin testified that pursuant to RCMH policy, after 5 p.m. on the day of the concert, the only security clearance he was permitted to give anyone was an "all access"

pass allowing unrestricted access to all nonpublic areas of RCMH, including the dressing rooms. (Ex. M at 42:12-43:3; 51:8-52:16; 57:8-17). Marin testified that he was not permitted to allow anyone passed the interior Stage Door entrance without issuing that person an "all access" pass. (*Id.*) Marin testified that he would only allow an individual entry into RCMH through the Stage Door to get to their seat if that person had an "all access" pass, and a ticket to the show. (Ex. M at 57:8-17).

24.     Security Officer Marin allowed Plaintiff access into RCMH through the interior doors of the Stage Door entrance. (Esser Aff. at ¶ 18). In order to do so, he had to unlock the interior door by pressing a button to "buzz" Plaintiff inside. (Ex. M at 13:18-14:11; 23:10-25; 40:18-42:3).

25.     All areas beyond the interior stage doors are considered "backstage areas" and require security clearance. (Ex. H at 94:7-10); (Ex. I at 27:18-28:22). Officer Marin gave Plaintiff that clearance by allowing him through the door after 5 p.m. without restriction. (Ex. H at 102). Plaintiff did not trespass into any backstage area of RCMH because he was specifically allowed to enter into the backstage areas of RCMH by Security Officer Marin. (Esser Aff. at ¶ 18).

26.     Plaintiff's friend remained waiting for Plaintiff at the Stage Door entrance. (Esser Aff. at ¶ 18).

27.     Being the first time that Plaintiff entered RCMH through the Stage Door entrance, Plaintiff was not familiar with the physical layout of the backstage areas of RCMH. (*Id.*)

28.     Plaintiff did not know how to get to Clear Channel's offices. (*Id.*)

29.     Several backstage areas of RCMH, including the elevators, are monitored by surveillance cameras which record in time lapse. (Exhibit V and W at 19:29-19:50). The Security Officer assigned to the Command Center, located directly next to the Stage Door Security Officer's desk, is responsible for watching the surveillance monitors. (Ex. K at 17:2-18:23). The Command

Center Security Officer on duty at the Elton John concert was Kevin Blakeney. (Ex. K at 8:24-9:16).

30.     Plaintiff got on the elevator at 7:29:52 p.m. and traveled to the fourth floor where Clear Channel's offices were located. (Ex. W at 19:29:52). Plaintiff spoke with a representative from Clear Channel who declined to grant Brad Joblin access into RCMH through the Stage Door entrance. (Esser Aff. at ¶ 21).

31.     Plaintiff then got back on the elevator at the fourth floor and attempted to figure out the way to get to his seat from the Stage Door entrance, since Security Officer Marin gave him authorization to go to his concert seat *via* the backstage route. (Ex. V at 19:34); (Esser Aff at ¶ 22).

32.     There were no signs posted in the elevator or the Stage Door entry area indicating where concert seating was located. (Esser Aff at ¶ 23); (Ex. M at 57:8-58:4). Plaintiff did not see any RCMH building directory indicating where any dressing were located during the time he was in the backstage areas. (Esser Aff at ¶ 23). In any event, the directory that Defendant claims existed for July 16, 2004 does not indicate where concert seating was located and does not state that "dressing rooms" were located on the third floor. (Ex. O).

33.     Plaintiff exited the elevator at the "ST" Level, used the bathroom, and asked someone how to get to his seats from the backstage area. (Esser Aff at ¶ 24). The individual was unable to give Plaintiff directions, but indicated that he thought Plaintiff could get to his seat from one level below the "ST" level, since the orchestra section of RCMH slopes down. (*Id.*) Plaintiff then traveled one level down to the "B" level, and realized that could not have been the way to get to his seat. (*Id.* at ¶ 25). Plaintiff then looked at his watch and realized it was getting close to 8:00 p.m. show time and he had to return to his friend. (*Id.* at ¶ 25). Plaintiff took the elevator from the "B" Level to the "M" level (Stage Door Level) at 7:43 p.m. (Ex. V at19:43-19:44);(Esser Aff at ¶ 25).