34. Plaintiff met his friend at the Stage Door entrance. (Esser Aff at ¶ 26). After a short discussion, the two decided that Plaintiff would go to his seat *via* the Stage Door entrance while Mr. Joblin would use the main entrance to RCMH. (*Id.*) Plaintiff and his friend decided the two would separate and meet at their seats for convenience sake. (*Id.*) Because security had authorized Plaintiff to enter RCMH through the Stage Door, he did not have to wait on any admission line and could get to his seat faster, and thus not miss any of the concert. (*Id.*) Plaintiff had to use the restroom once again prior to the concert. (*Id.*)

35. Plaintiff was once again allowed by security to enter the RCMH back stage areas through the Stage Door entrance, this time allowing Plaintiff to enter to go to his seat. (Esser Aff. at ¶ 27); (Ex. C at 101:23-102:14). **Again**, Plaintiff was not restricted by security in any way, and was not told that he was prohibited from going to any particular floor. (Esser Aff. at ¶ 27). Further, Plaintiff was not told that he did anything wrong, or that he in any way breached security by walking around the backstage areas of RCMH. (*Id.*) Officer Marin then "buzzed" Plaintiff into the backstage area of RCMH again.(*Id.*)

36. Mistakenly, Plaintiff then got on a crowded elevator which was going up at 7:48:54 p.m. (Ex. W at 19:48:54);(Esser Aff. at ¶ 28). Plaintiff got off at the first stop made by the elevator, the third floor. (*Id.*) Contrary to the testimony of the Security Officer posted at the third floor, Curtis Robinson, Plaintiff was the only person to exit the elevator.(Ex. W at 19:48:54);(Ex. J at 51:4-52:14).

37. Security Officer Robinson's post was on the third floor in front of the elevator bank. (Ex. J at 19:18-22:19; 23:11-17). Robinson is depicted on the surveillance tape sitting at his post in front of the elevator when Plaintiff exits the elevator at 7:48:54 p.m. and Robinson is standing in

front of the elevator bank facing Plaintiff when Plaintiff gets back on the descending elevator at 7:50:29 p.m. (Ex. W at 19:48:54); (Ex. V at 19:50:29).

38. Officer Robinson testified that he saw Plaintiff and thought to himself we have a situation where "this person is lost." (Ex. J at 36:20-37:4).

39. Once Plaintiff got off the crowded elevator, he realized that he had gotten off at the wrong floor and remained on the third floor standing directly in front of the elevators just long enough for a descending elevator to arrive. (Esser Aff. at ¶ 29). Plaintiff was only on the third floor from 7:48:54p.m. until 7:50:29 p.m. (approximately one minute and thirty five seconds). (*Id.*);(Ex. W at 19:48:54); (Ex. V at 19:50:29).

40. During the time that Plaintiff was in the back stage areas of RCMH, he was never approached by security or any individual to indicate that RCMH considered him to be in breach of security or trespassing. (Esser Aff.at ¶¶ 30, 46).

41. RCMH Security Officer Anthony Ermillio testified that he heard Robinson state over the radio, "I have a person here with a Cablevision identification; he's not supposed to be here. . . he's in the elevator." (Ex. I at 26:12-21). Therefore, Robinson was aware that Plaintiff exited the third floor *via* elevator. As the surveillance videos show, Plaintiff did not run away from Officer Robinson and he did not leave the third floor by running down the stairs. (Ex. W at 19:48:54); (Ex. V at 19:50:29).

42. Unbeknownst to Plaintiff on the night of the concert, the third floor was the location of the hospitality suite for the Elton John Band ("Band"). (Esser Aff. at ¶¶ 33-34);(Ex. O)(Ex. D at155:8-156:7(noting Oleynick's lack of knowledge whether Plaintiff knew the third floor was a highly restricted area). The third floor was not where Elton John's dressing room was located and

it was not where Elton John's hospitality suite was located. (Ex. O).

43. Plaintiff never entered the hospitality suite (Ex. J at 36:3-5), and remained in front of the elevator bank for the entire one minute and thirty five seconds he was on the third floor. (Esser Aff. at ¶ 29);(Ex. W at 19:48:54); (Ex. V at 19:50:29). Plaintiff never intended to go to the Band's hospitality suite or to Elton John's dressing room or his hospitality suite. (Esser Aff. at ¶ 35);(Ex. D at 155:8-156:7) Plaintiff was simply on his way to his seat. (Esser Aff.at ¶ 35).

44. Later, Plaintiff learned through discovery in this matter that Elton John's dressing room was located on the second floor. (Ex. O). Plaintiff, however, never went to the second floor and the surveillance tapes confirm this fact. (Esser Aff. at ¶ 36);(Ex. V and W at 19:29-20:00).

45. After Plaintiff left the third floor *via* descending elevator, he got off at the "ST"level, went to the bathroom, and then found his way to the orchestra section of the concert hall, where his seats were. (Esser Aff.at ¶ 37). Plaintiff's seats were just rows away from the stage where Elton John would be performing. (Esser Aff.at ¶ 38).

46. To get to the orchestra section, Plaintiff had to exit the back stage areas of RCMH through the 51st wing door, which led directly to the orchestra section.(Esser Aff.at ¶ 39). Security Officer Anthony Ermillio was posted at that door and had brief contact with Plaintiff. (Ex. I at 15:7-14;16:7-17:11; 20:9-22:10; 30:25-31:6). Ermillio testified that he did not consider his interaction with Plaintiff to be a security incident. (*Id.* at 41:18-42:22). Ermillio did not try to detain Plaintiff and Plaintiff did not run away from him. (*Id.*) Ermillio testified that he did not follow Plaintiff to his seat, he did not watch Plaintiff walk to his seat and, therefore, he did not know where Plaintiff's seats were located during the concert. (*Id.* at 20:9-22:10; 23:14-24:3; 28:24-31:6; 44:11-13). Ermillio did not "visually observe" Plaintiff throughout the concert. (*Id.*) There was no radio