discussion amongst security personnel about Plaintiff during the course of the concert. (Ex. M at 64:14-18).

47. Plaintiff's friend arrived at their seats after Plaintiff and the two watched the concert without any indication of any security issues or problems. (Esser Aff.at ¶ 41).

48. Plaintiff was never approached by any security personnel or any RCMH personnel regarding any security incident. (*Id.* at ¶¶41-42, 46).

49. After the show, Plaintiff and his friend remained in the orchestra section after the crowd dispersed, and they took pictures of each other in front of the stage. (*Id.* at ¶42). Still, Plaintiff was not approached by any RCMH personnel for any reason, let alone to indicate he breached security or committed any misconduct prior to the show. (*Id.* at ¶¶41-42, 46).

50. Although Officer's Ermillio's duties included remaining in the orchestra section until all patrons were cleared out, he testified that he did not see Plaintiff and his friend after the show taking pictures in front of the stage. (Ex. I at 30:25-31:6; 42:23-43:6; 44:11-13).

51. After the concert, Plaintiff could not find his validated parking ticket and thought he may have left it at the Stage Door entrance to RCMH. (Esser Aff.at ¶ 43). Plaintiff and his friend exited RCMH and walked to the 51st street Stage Door entrance. (*Id.*)

52. Plaintiff never attempted to remove any barrier to get back stage. (*Id.* at ¶ 44).

53. Security allowed Plaintiff to enter into the vestibule of the Stage Door area and Plaintiff asked security if anyone found his validated parking ticket. (*Id.* at ¶ 45). Security Officer Blakeney and Security Supervisor Olga Mercado had contact with Plaintiff in the Stage Door vestibule after the show. (Ex. K at 48:19- 49:6); (Ex. L at 102:5-10).

54. A security officer then asked Plaintiff for his concert ticket and identification, took the items and left Plaintiff's vicinity.(Esser Aff.at ¶ 45). Plaintiff fully cooperated with security. (Ex. K at 48:19- 49:6);(Ex. L at 102:5-10). The security officers never gave Plaintiff any indication that he had done anything wrong.(Esser Aff. at ¶¶ 45-46).

55. A security officer returned Plaintiff's items to him. (*Id.*) Plaintiff was not escorted out of the building, and he left on his own. (*Id.*); (Ex. K at 53:10-12); (Ex. L at 115:11-116:12). Plaintiff left RCMH without any indication that any "security incident" occurred.(Esser Aff. at ¶¶ 41-42, 45-46).

56. Plaintiff later learned through discovery in this matter that Officer Mercado accused Plaintiff and his friend of breaching security by trespassing into Elton John's dressing room at 7:30 p.m. and then running down the stairs to their seats when approached by Officer Robinson. (Ex. L at 43:13-45:22; 47:4-48:6); (Ex. P). Mercado also testified that Plaintiff was identified and visually observed by Officer Ermillio throughout the concert. (Ex. L at 68:18-70:18; 77:24-78:9). Mercado testified that prior to the start of the show, Ermillio pointed out where Plaintiff's seats were and she instructed him to "keep an eye" on Plaintiff. (Ex. L at 68:18-70:18; 72:19-73:15; 77:24-78:9). Mercado did not instruct Ermillio or any other security officer to confront Plaintiff before or during the concert because she no longer considered Plaintiff to be a security threat to Elton John even though Plaintiff was sitting just rows from the stage, she did not know whether Plaintiff possessed any weapons including a gun, and she did not know why Plaintiff was allegedly in Elton John's dressing room. (Ex. L at 82:21:21-83:11; 83:19-84:24; 86:8-21). Mercado claims she returned to the orchestra section just prior to the end of the show in order to observe Plaintiff. (Ex. L at 86:25-87:23). Despite the fact that Plaintiff and his friend took pictures after the concert in front of the

11

stage, Mercado testified that she did not observe Plaintiff taking any pictures after the show. (Ex. L at 90:21-24). After the concert, Mercado claims she followed Plaintiff and his friend "into" the men's bathroom, but chose not to confront them. (Ex. L at 91:23-93:6). Mercado then claimed that she followed Plaintiff out the exit door and to the Stage Door entrance, at which time she contacted George Haskel, then Vice President of Security Operations at RCMH to report Plaintiff. (Ex. L at 93:3-101:11); (Ex. H at 48:12-15; 50:4-54:8).

57.  Despite allegedly following Plaintiff and his friend and watching them for a period of time after the concert, at deposition, Mercado could not provide any identifying physical traits of Brad Joblin, *including his race*. (Ex. L at 98:21- 101:17).

58.  Officer Mercado's testimony regarding the allegations against Plaintiff is contradicted by RCMH surveillance tapes, testimony from Officer Ermillio and Plaintiff, and common sense and logic. First, the surveillance tapes show Plaintiff riding the elevator (without his friend) during the time period 7:29 p.m. until 7:50 p.m. (Exhibits V & W at 19:29-19:50). At 7:30 p.m., Plaintiff was still on the fourth floor where the Clear Channel offices were located. (Ex. W at 19:29-19:34). Plaintiff remained on that floor until 7:34 p.m. (*Id.*) The tapes demonstrate that Plaintiff was never on the second floor where Elton John's dressing room was located, and although Plaintiff was on the third floor for a short amount of time, he did not run down the stairs and away from Officer Robinson because Plaintiff is seen on the tapes calmly walking onto a descending elevator.(Ex. W at 19:48) (Ex. V at 19:50).

59.  Officer Ermillio's testimony contradicts Mercado's testimony and further undermines her credibility. Officer Ermillio had brief contact with Plaintiff when Plaintiff exited the 51st wing door into the orchestra. (Ex. I at 15:7-14;16:7-17:11; 20:9-22:10; 30:25-31:6). Ermillio testified that

12

Plaintiff was alone when he exited the backstage areas into the orchestra.(*Id.*) Ermillio did not consider his interaction with Plaintiff to be a "security incident" and he lost sight of Plaintiff and did not know where Plaintiff was sitting. (*Id.* at 41:18-42:22). Therefore, he could not have pointed Plaintiff out to Mercado and he did not visually observe Plaintiff during the concert. (*Id.* at 20:9-22:10; 23:14-24:3; 28:24-31:6; 44:11-13). Notably, although Mercado testified that Ermillio pointed out where Plaintiff was sitting, she could not answer any of counsel's questions at deposition with respect to Plaintiff's seat location. (Ex. L at 72:5-18).

60. Months after the concert and Plaintiff's termination, Clinton Neils, Director of Security of RCMH, asked Ermillio to prepare a report regarding his contact with Plaintiff on the night of the concert. (Ex. I at 33:6-34:16). Ermillio did so and handed the report to Neils. (*Id.* at 36:13-38:21). The statement explained Ermillio's encounter with Plaintiff just as he testified at his deposition. (*Id.* at 38:11-13). The defense did not produce this report because it was lost. (Frumkin Decl. at ¶ 30).

61. The record reflects that at 10:15 p.m. after the concert, Officer Mercado reported to George Haskel, that at 7:30 p.m., Plaintiff and his friend breached security by trespassing into Elton John's dressing room and then they ran down the stairs to their seats when approached by Security Officer Robinson. (Ex. H at 48:12-15; 50:4-54:8; 83);(Ex. P). Officer Mercado also reported that Plaintiff was visually observed throughout the concert by Officer Ermillio, and that after the concert Plaintiff moved a barrier to get backstage.(*Id.*)

62. Mr. Haskel spoke only briefly- less than ten minutes- with Officer Mercado about Mr. Esser.(Ex. H at 48:12-15; 50:4-54:8; 83). Haskel had the conversation with Mercado on the sidewalk outside of the Stage Door area, while Plaintiff was inside the Stage Door vestibule asking whether

13

anyone found his validated parking ticket. (*Id.*) George Haskel, never had any contact with Plaintiff on the night of the concert. (*Id.* at 51:2-6). Haskel instructed Mercado to remove Plaintiff from the building and to prepare an security incident report detailing the allegations. (*Id.* at 50:4-54:8).

63. That brief conversation was the only discussion Haskel had with Mercado about Mr. Esser. (*Id.* at 54:5-8). Haskel did not ask Mercado whether she conducted any investigation with respect to Mr. Esser, or whether she took any steps to positively identify Plaintiff as the person alleged to be in or near Elton John's dressing room. (*Id.* at 59:16-63:23). Haskel did not even see Mercado's security incident report about Mr. Esser until April 12, 2006, well after Plaintiff's termination. (*Id.* at 58:6-9; 85:9-86:24). April 12, 2006 was the day prior to George Haskel's deposition.

64. Neither security guard Mercado nor any other RCMH security officer took any steps to positively identify Plaintiff and his friend as individuals who trespassed into Elton John's dressing room. (*Id.* at 52:2-25; 96:23-97:25); (Ex. L at 114:6-23); (Ex I at 32:7-19); (Ex.M at 69:13-70:7). Neither Haskel nor Mercado bothered to inquire whether any security officer had given Plaintiff security clearance to be in the backstage areas of RCMH. (Ex. H at 96:23-97:25) (Ex. L at 125:21-126:17).

65. No RCMH security personnel, including Security Supervisor Olga Mecado, contacted Security Officers Robinson, Ermillio, or Marin after the concert in order to identify Plaintiff. (Ex. I at 29:6-30:10); (Ex. J at 74:7-75:6 ); (Ex. M at 69:13-70:7; 78:10-79:3); (Ex. L at 113:19-114:23).

66. Neither Mercado, nor any other security officer at RCMH conducted any investigation with respect to Mr. Esser. (Ex. H at 64:17-20); (Ex. L at 125:21-126:7; 129:15-130:4); (Ex. G at 153:23-154:3; 154:25-155:9); (Ex. I at 40:23-41:5); (Ex M at 80:16-23).

67. Haskel did not conduct an investigation with respect to Plaintiff. (Ex. H at 64:17-20). Haskel did not speak with any other security officer besides Mercado to obtain information about Plaintiff. (*Id.* at 54:9-56:9;96:23-97:25); (Ex. I at 32:20-34:16); (Ex. M at 76:13-76:23). Mr. Haskel did not view any RCMH surveillance tapes in order to positively identify Plaintiff as a trespasser into or near Elton John's dressing room (Ex. H at 107:5-13); did not know or ask whether any security officer had viewed the surveillance tapes; and did not instruct any security officer to view the tapes. (*Id.* at 107:5-13)(Ex. I at 40:16-22); (Ex. M at 79:13-22; 82:16-23);(Ex. K at 58:5-22);(Ex. L at 129:15-130:4).

68. Further, Clinton Neils, Director of Security at RCMH, never had any contact with Plaintiff on the night of the concert and was never contacted by any RCMH security officer, including Mr. Haskel, regarding Plaintiff on the night of the concert. (Ex. H at 56:16-58:5); (Ex. G at 176:11-177:14; 181:13-182:9; 183:7-10; 199:2-5; 200:13-23); (Ex. I at 32:20-34:16); (Ex. L at 118:7-16). Mr. Neils had no knowledge of the allegations against Plaintiff until after the concert. (Ex. G at 181:13-182:9; 183:7-10; 199:2-5; 200:13-23)

69. Neils did not conduct an investigation with respect to Plaintiff. (*Id.* at 153:23-25; 154:2-3; 154:25; 155:2-9). Neils did not speak with any security officers to obtain information about Plaintiff until months after Plaintiff's termination.(*Id.* at 146:19-153:22; 181:10-183:10);(Ex I at 33:6-34:16). Neils did not view any RCMH surveillance tapes in order to positively identify Plaintiff as a trespasser into Elton John's dressing room (Ex. G at 154:4-6); did not know or ask whether any security officer had viewed the surveillance tapes (*Id.*); and did not instruct any security officer to view the tapes. (*Id.* at 181:10-183:10) (Ex. I at 40:16-22) (Ex. M at 79:13-22; 82:16-23);(Ex. K at 58:5-22). The only information Neils had about Plaintiff was what was reported to him