by Mr. Haskel during one brief conversation. (Ex. G at 153:5-18). Haskel's conversation with Neils about Plaintiff was based solely on Haskel's brief (less than ten minutes) conversation with Olga Mercado. (Ex. H at 57:15-58:9).

70. On Monday, July 19, 2004, George Haskel wrote an e-mail to Paul Ryan, Director of Corporate Security for Cablevision, and reported only that Plaintiff attempted to abuse his employee status by attempting to gain entry through the Stage Door entrance of RCMH.(Ex. R); (Ex. H at 64:21-65:8; 69:9-71:12; 72:24-73:22). George Haskel's e-mail to Paul Ryan did not inform Mr. Ryan of any allegation against Plaintiff pertaining to trespassing into or being near Elton John's dressing room with a companion. (Ex. R); (Ex. H at 64:21-65:8; 69:9-71:12; 72:24-73:22). Mr. Haskel's e-mail does not recommend any disciplinary action be taken against Plaintiff. (*Id.*)

71. Mr. Haskel never participated in any conference call with anyone from RASCO or Cablevision with respect to the allegations against Plaintiff. (Ex. H at 77:4-8);(Ex. D at 169:2-8).

72. John Oleynick was then contacted by his supervisor, Brian Gault, Executive Vice President of RASCO, and was told only that Peter Esser was involved in an "incident" at RCMH. (Ex. D at 102:17-25). Oleynick didn't ask Gault for any details even though Oleynick thought the situation was serious and could lead to Plaintiff's termination. (*Id.* at 110:18-113:5). Oleynick didn't think it was important or necessary to get any details of the alleged "incident" from Gault. (*Id.*)

73. Mr. Oleynick called Plaintiff on or about July 19, 2004, but did not inform Plaintiff that he was accused of any misconduct. (*Id.* at 108-116:2-5;118:10-121:13). Instead, Mr. Oleynick asked Plaintiff to tell him "what happened at the Elton John concert?" (Esser Aff. at ¶ 47) (Ex. C at 123:4-127:16). Oleynick did not ask Plaintiff for a full accounting of every movement he made at the Elton John concert. (Esser Aff. at ¶ 47) (Ex. C at 122:15-19; 123:4-127:16).

16

74. Plaintiff was truthful and told Oleynick that nothing happened, because Plaintiff was never made aware of any issues or problems at the concert. (Ex. D at 109:18-25); (Esser Aff. at ¶¶ 48-49).

75. Plaintiff told Oleynick about his contact with security at the concert. (*Id.*); (Ex. D at 127:3-128:10). Plaintiff also told Oleynick that he was permitted to enter the backstage areas of RCMH through the Stage Door entrance after he had his parking ticket validated. (Ex. D at 141:13-142:17). Plaintiff explained that his friend was not permitted to enter through the Stage Door into the backstage areas of RCMH because he was not a Cablevision employee. (*Id.* at 127:12-129:10).

76. Plaintiff then asked Mr. Oleynick why he was asking, and Mr. Oleynick refused to provide any information to Plaintiff and ended the phone call by telling Plaintiff that he had to take another call. (Esser Aff. at ¶ 49).

77. Mr. Oleynick never informed Plaintiff of any allegations against him or that the allegations again him were serious and could affect his employment with the company. (Ex. D at 112:12-20; 115:19-116:5; 119:10-120:15).

78. On or about Wednesday, July 21, 2004, John Oleynick, Elena Ferraro, Employee Relations Manager, Mindi Jacobs, Employee Relations Supervisor, J. Brian Gault, and Eric Adler, in-house attorney for Cablevision (collectively referred to as "RASCO/Cablevision management"), participated in a telephone conference call with Clinton Neils from RCMH about Plaintiff. (*Id.* at 122:4-23); (Ex. E at 143:4-152:25).

79. During the conference call, Neils informed RASCO/Cablevision management that Plaintiff breached security by being on the floor of Elton John's dressing room without authorization; running away from security when approached; acting erratically during the concert; and removing

17

a barricade to get backstage after the concert. (Ex. D at 99:21-100:8; 102:11-16;124:12-126:2; 155:18-156:7; 173:11-174:6; 223:23-226:14). Contrary to Oleynick's deposition testimony (*Id.* at 129:16-130:5) and the Defense's assertion, Neils did not make a recommendation that Plaintiff be terminated. (Ex. G at 176:11-177:9).

80. At his deposition, Neils testified that he did not make a recommendation to terminate Plaintiff because he was not involved in any investigation regarding Plaintiff or any dealings with Plaintiff at RCMH. (*Id.* at 154:25-155:9;176:11-177:9; 199:2-5; 200:13-23). Further, contrary to the Defense's argument, Neils did not characterize the "incident" he was reporting as "serious." (*Id.* at 176:11-177:9).

81. Clinton Neils testified that RCMH did not conduct an investigation regarding Plaintiff. (*Id.* at 153:23-154:3).

82. During the call, neither John Oleynick, J. Brian Gault, nor anyone else from RASCO asked Clinton Neils whether an investigation was conducted by RCMH with respect to Plaintiff. (Ex. D at130:6-132:25; 157:12-159:6);(Ex. E at 150:3-8; 174:25-176:16);(Ex. F at 145:3-12; 146:20-147:11; 148:4-149:21;155:22-159:7).

83. During the call, neither John Oleynick, J. Brian Gault, nor anyone else from RASCO requested any documentation from Clinton Neils regarding the allegations against Plaintiff, including any security reports which may have detailed the allegations against Plaintiff. (Ex. D at at 137:2-11; 143:5-13; 150:19-151:8;169:9-15).

84. Such documentation was not requested by RASCO until after Plaintiff's termination. (Ex. H at 75:12-25; 77-80:9; 87:3-22; 104:24-105:21); (Exhibits "S", "T" & "U"). Such documentation was not requested by RASCO until after the Defendant received a letter from

18

Plaintiff's counsel alleging that Plaintiff was terminated in violation of the FMLA. (Ex. Y) (Ex. E at 202:2-203:4; 204:17-25; 208:2-3; 211:18-212:8).

85. Despite the fact that there was a discussion during the conference call about RCMH surveillance tapes, and Clinton Neils informed RASCO/Cablevision management that surveillance tapes existed, but had not been reviewed by RCMH, no one from RASCO/Cablevision management requested to view any surveillance tapes. (Ex. D at 137:12-139:12); (Ex. E at 153:3-154:11; 236:23-237:6);(Ex. G at 169:21-170:11).

86. During the conference call, no one from RASCO/Cablevision management asked to speak with any security guard who purportedly had contact with Plaintiff at the concert. In fact, no one even asked for the names of such security guards. (Ex. D at 125:10-22;151:12-23; 177:21-179:6); (Ex. H at 75:12-25); (Ex. E at 163:20-164:14; 199:5-10; 204:4-16).

87. During the conference call, John Oleynick and J. Brian Gault decided to terminate Plaintiff. (Ex. D at 135:24-136:2).

88. John Oleynick testified at deposition that the reason Plaintiff was terminated was that it was reported to him by Clinton Neils that Plaintiff breached security at RCMH by being on the same floor as Elton John's dressing room without authorization; Plaintiff ran away from security when approached; Plaintiff acted erratically during the concert; and Plaintiff attempted to get backstage after the concert by removing a barricade. (*Id.* at 99:21-100:8; 102:11-16;124:12-126:2; 173:11-174:6; 223:23-226:14).

89. John Oleynick testified that he did not have a problem, i.e., Plaintiff was not terminated because of the fact, that he attended the Elton John concert while on FMLA leave. (*Id.* at 107: 9-12).

90. John Oleynick testified that he did not have a problem, i.e., Plaintiff was not terminated because of the fact that he used his Cablevision identification to gain entry to the backstage areas of RCMH after having his parking ticket validated. (*Id.* at 128:24-129:10; 227:3-16). Oleynick testified that he never believed at any time that Plaintiff entered the backstage areas of RCMH improperly. (*Id.* at 128:11- 129:10).

91. Oleynick admitted that he did not have a problem with Plaintiff using his Cablevision identification to gain entry through the back stage areas, if Plaintiff did so to get to his seat. (*Id.* at 128:24-129:10; 227:3-16).

92. Oleynick also testified that he would have had no problem with Plaintiff going backstage after the concert if Plaintiff was permitted to do so. (*Id.* at 166:11-167:2). Oleynick testified that if the report from RCMH was incorrect, Esser would not have been terminated. (*Id.* at 140:23-141:18).

93. In deviation of RASCO's policies and procedures for conducting workplace investigations, Mr. Oleynick and Mr. Gault made the decision to terminate Plaintiff without ever having given Plaintiff the opportunity to refute the allegations against him. (*Id.* at 108-116:2-5;118:10-121:13; 135).

94. Further, Mr. Oleynick made the decision to terminate Plaintiff without ever speaking to Greg McNally, Plaintiff's direct supervisor, who interacted with Plaintiff on a frequent basis and who would therefore, better know Plaintiff's character and whether Plaintiff had the propensity to breach security, trespass into Elton's John's dressing room, and to remove a barrier to get back stage. (*Id.* at 116:6-117:2-6; 159:20-24).

95. Plaintiff had no record of prior incidents of misconduct (*Id.* 64:20-65:12); (Ex. E at 37:21-39:5).

96. On July 26, 2004, the day that Plaintiff was informed of his termination, John Oleynick and Employee Relations Manager, Elena Ferraro attempted to have a conference call with Plaintiff. Plaintiff, however, did not answer the phone. (Ex. D at 179:16-183:19; 185:2-187:6).

97. Mr. Oleynick left a message for Plaintiff and then not realizing that the answering machine continued to record him, he had a conversation with Ms. Ferraro.(*Id.*);(Ex. X).

98. In the recording, Mr. Oleynick demonstrates his animosity towards Plaintiff for taking FMLA leave by making a comment in a snide tone, "for a guy that is supposedly so hurt, (pause and snickering) it is interesting that he is not home." (*Id.*);(Ex. X); (Esser Aff. at ¶ 51).

99. Later that day, Plaintiff returned Mr. Oleynick's call and had a conference call with Mr. Oleynick and Ms. Ferraro. During that conversation, Oleynick claimed that his comment on the answering machine was not regarding Mr. Esser, but another employee. (Ex. D at 190:16-192:23); (Esser Aff. at ¶ 51).

100. Mr. Oleynick, however, admitted at deposition that he lied to Mr. Esser and the comment on the answering machine tape was in reference to Mr. Esser. (Ex. D at 190:16-192:23).

101. Mr. Oleynick informed Plaintiff that he was being terminated due to a report from RCMH. (*Id.* at 192:25-195:10); (Ex E at 174:25-176:16).

102. Plaintiff asked both Oleynick and Ferraro for specific information why he was being terminated and both refused to provide Plaintiff with the information.(Ex. D at 192:25-195:10);(Ex E at 157:4-14; 166:2-8; 171:17-172:14; 176:20-178:20; 191:3-20);(Esser Aff. at ¶ 52).

103. Plaintiff did not learn of the reason for his termination until he applied for unemployment benefits and learned that Cablevision asserted that he violated company policy by allegedly trespassing into a highly restricted area and breached security while attending a concert at Radio City Music Hall on July 16, 2004. (Esser Aff. at ¶ 53). Notably, Cablevision did not contest Plaintiff's application for unemployment benefits because they could not or did not want to provide information regarding the allegations against Plaintiff to the N.Y.S. Dept. of Labor. (Ex E at 225:5-227:16).

104. Mr. Oleynick testified that he based his decision to terminate Plaintiff upon his investigation, i.e., his conversation with Mr. Esser wherein he did not inform Mr. Esser what he was accused of, and what was reported to him by Radio City Music Hall security. (Ex D. at 219:23-220:5).

105. Elena Ferraro testified at deposition that an investigation was conducted by RASCO and that Plaintiff was found to have committed misconduct. (Ex E at 155:3-156:24; 159:21-160:20).

106. The manner in which Oleynick questioned Plaintiff on July 19, 2004, deviated from RASCO's policies and procedures on conducting workplace investigations and Mr. Oleynick's own past practice with respect to workplace investigations of employees who were not out on FMLA leave. (Ex E at 72:15-73:16; 76:7-80:11; 102:13-103:24; 104:24-106:5; 108:11-25; 110:4-15; 112:22-113:2; 126:9-128:15); (Ex. Q); (Ex. D at13:25-21:20; 49:9-54:25).

107. Deposition testimony of Elena Ferraro demonstrates that it is Defendant's policy and procedure to conduct employee investigations by confronting employees with specific information regarding allegations of misconduct against him/her and providing the employee an opportunity to rebut the allegations. (Ex. E at 72:15-73:16; 76:7-80:11; 102:13-103:24; 104:24-106:5; 108:11-25; 110:4-15; 112:22-113:2; 126:9-128:15).

108.  Defendant's written guidelines on conducting workplace investigations also instruct that it is proper to inform the employee of the specific allegations against him and to allow the employee the opportunity to address the specific allegations. (Ex. Q). For example, the "Investigative Notes Outline" section of the guideline instructs an investigator to inform the alleged wrongdoer that a complaint has been made against him, and to "**question [the] employee about each specific allegation**." (Ex. Q, pg. RASCO-P 00059). The guidelines also provide an example of a mock interview with an employee named "James Bond" accused of sexual harassment which clearly indicates that the accused harasser was confronted with the allegations against him and allowed an opportunity to respond to the allegations. (Ex. Q, pgs. RASCO-P 00076-77).

109.  Ms. Ferraro also testified at deposition that a proper workplace investigation entails informing the employee of the specific allegations of misconduct against him or her. (Ex. E at 110:4-15; 112:22-113:2).

110.  Ms. Ferraro provided specific examples of instances where she conducted employee investigations in accordance with Defendant's policy and procedure for conducting workplace investigations. (Ex. E at 72:15-73:16; 76:7-80:11; 102:13-103:24; 104:24-106:5; 108:11-25; 110:4-15; 112:22-113:2; 126:9-128:15).

111.  Oleynick also provided specific examples of instances where he conducted employee investigations in accordance with Defendant's policy and procedure for conducting workplace investigations. (Ex. D at 13:25-21:20; 49:9-54:25).

112.  George Haskel, with 23 years of experience in conducting investigations, testified that it is not proper for a supervisor investigating an allegation of employee misconduct at a concert to simply ask the employee, "what happened at the concert?" without providing more information to

the employee. (Ex H at 21:9-18; 118:7-20). Mr. Haskel testified that asking a vague question such as what happened at the concert is not a proper way to conduct an investigation because it is too vague and does not provide the employee enough information to adequately respond to the allegations. (*Id.* at 118:7-119:2).

113.    Clinton Neils also testified that an employee should be informed of specific allegations of misconduct during an employee investigation so that the employee has an opportunity to give their side of the story. (Ex. G at 180:8-181:12; 183:11-185:8). Neils testified that if Plaintiff were a RCMH employee who was accused of misconduct, he (Neils) would have provided Plaintiff with specific information regarding the allegations against him and allowed Plaintiff the opportunity to respond to the allegations. (*Id.*).

114.    J. Brian Gault also testified that an employee should be informed during an employee investigation that he is possibly subject to discipline, including termination. (Ex. F at 130:4-131:11). Mr. Gault testified that the situation with Plaintiff was "that type of situation."(*Id.*)

115.    Deposition testimony of Elena Ferraro and John Oleynick demonstrates that Defendant did not follow its own procedures for conducting employee investigations related to misconduct and terminated Plaintiff, an employee on protected medical leave, without informing him of the allegations against him and providing him an opportunity to refute the allegations. (Ex. D at 112:12-20; 115:19-116:5; 119:10-120:15); (Ex E at 157:4-14; 166:2-8; 171:17-172:14; 176:20-178:20; 191:3-20).

116.    Defendant treated Plaintiff, an employee on protected FMLA leave, differently than employees not on FMLA leave because while other employees not on FMLA leave were afforded a proper employee investigation, Plaintiff was denied the same.(Ex. E. at 76-81, 102-107, 110-113;

157:4-14; 166:2-8; 171:17-172:14; 176:20-178:20; 191:3-20);(Ex. D at 13:25-21:20; 49:9-54:25; 112:12-20; 115:19-116:5; 119:10-120:15).

117.    Defendant's stated reason for Plaintiff's termination has shifted throughout the course of the litigation as the Defendant learned its initial position was not credible. The initial reason given by the Defense for Plaintiff's termination was that it was reported to RASCO by Clinton Neils that Plaintiff breached security at RCMH by being on the same floor as Elton John's dressing room without authorization; Plaintiff ran away from security when approached; Plaintiff acted erratically during the concert; and Plaintiff attempted to get backstage after the concert by removing a barricade. (Ex. D at 99:21-100:8; 102:11-16;124:12-126:2;173:11-174:6;223:23-226:14). After it was discovered by the Defense through discovery, however, that the slightest bit of due diligence with respect to following RASCO's own policies and procedures for conducting workplace investigations would have revealed that the security guard at the Stage Door entrance allowed Plaintiff into the backstage areas of RCMH without restrictions (Esser Aff. at ¶¶ 18-27); Plaintiff was never on the floor of Elton John's dressing room (second floor)(Esser Aff. at ¶ 36)(Exhibits V & W at 19:29-20:00); he mistakenly went to the third floor on the way to his seat (Esser Aff. at ¶ 28)(Ex. W at 19:48:54); (Ex. V at 19:50:29); he did not know the third floor was where the Elton John Band hospitality suite was located (Esser Aff. at ¶¶33-35); he was never approached by security at any time to indicate he was considered to be trespassing (Esser Aff. at ¶¶18-46); he did not run away from any security guard (Esser Aff. at ¶¶ 32, 40)(Ex. W at 19:48:54); he was never approached by security during the concert (Esser Aff. at ¶¶18-46); he and his friend took pictures after the show in front of the stage without being approached by security (Esser Aff. at ¶ 42)(Ex. BB); and Plaintiff did not attempt to get backstage after the show was over (Esser Aff. at ¶ 44), the Defense changed its stated

25

reason for Plaintiff's termination to his "being in backstage areas of RCMH on the night of the Elton John concert." *See* Defendant's Memorandum of Law in Support of Its Motion For Summary Judgment, pages 13, 18. Critically, Oleynick could have discovered that this was the case with even the slightest attempt to investigate what actually occurred. (*See* ¶¶ 16-102, *supra*).

Dated: White Plains, New York
        June 19, 2006

Respectfully submitted,

By: _____
William D. Frumkin (WF 2173)
SAPIR & FRUMKIN LLP
Attorneys for Plaintiff
399 Knollwood Road, Suite 310
White Plains, New York 10603
(914) 328-0366

F:\APPLICAT\WP\Esser\R.56.1.statement.wpd\dp\rlh

# AFFIDAVIT OF SERVICE

STATE OF NEW YORK            )
COUNTY OF WESTCHESTER        )ss.:

RACHEL HORTON, being duly sworn, deposes and states as follows:

That deponent is not a party to this action, is over 18 years of age and resides in Hopewell Junction, New York. On the 19th day of June, 2006, your deponent served the within PLAINTIFF'S STATEMENT PURSUANT TO LOCAL RULE 56.1(b) upon:

Kevin Smith, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178
Attorney for Defendant

the addresses designated by said attorney for that purpose, by depositing true copies of same enclosed in post-paid wrappers, by first class mail, in an official depository under the exclusive care and custody of the United States Postal Service within New York State.

/s/ Rachel Horton

Sworn to before me this
19th day of June, 2006.

/s/ Notary Public

WILLIAM D. FRUMKIN
Notary Public, State of New York
No. 02FR4892219
Qualified in Westchester County
Commission Expires April 13, 2007