UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X

PETER ESSER,

                     Plaintiff,

       - against -

RAINBOW ADVERTISING SALES CORP. d/b/a
CABLEVISION ADVERTISING SALES,

                     Defendant.

- - - - - - - - - - - - - - - - - - - - X

**ECF CASE**

05 Civ. 3703 (WCC)

**OPINION
AND ORDER**

**A P P E A R A N C E S :**

SAPIR & FRUMKIN LLP
**Attorneys for Plaintiff**
399 Knollwood Road, Suite 310
White Plains, New York 10603

WILLIAM D. FRUMKIN, ESQ.
KATHRYN E. WHITE, ESQ.

     Of Counsel

KELLEY DRYE & WARREN LLP
**Attorneys for Defendant**
101 Park Avenue
New York, New York 10178

BARBARA E. HOEY, ESQ.
DAMON W. SUDEN, ESQ.
KEVIN J. SMITH, ESQ.

     Of Counsel

**Copies E-Mailed to Counsel of Record**

CONNER, Senior D.J.:

Plaintiff Peter Esser brings this action against Rainbow Advertising Sales Corp. d/b/a Cablevision Advertising Sales ("RASCO") for interference and retaliation under 29 U.S.C. §§ 2614 and 2615 of the Family and Medical Leave Act ("FMLA"). Defendant moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated herein, defendant's motion is granted as to the interference claim and denied as to the retaliation claim.

## BACKGROUND

Plaintiff was employed by RASCO in January 1998 as an Account Executive and was working under the supervision of manager Greg McNally. (Esser Dep. at 11-13.) Esser's duties included selling advertisements for local cable stations. (Esser Aff. ¶ 3.) During the first quarter of 2004, Esser was placed on a "recovery plan" designed to improve his poor sales record. (Esser Dep. at 217.) On or around May 10, 2004,[1] McNally completed an evaluation of Esser's performance that recommended Esser remain on the recovery plan for an additional thirty days with the potential to be placed on a "performance improvement plan" if his sales still had not improved.[2] (*Id.* at 217-19.) Prior to this evaluation, Esser learned that he was going to need surgery on his wrists for carpal tunnel syndrome. (Esser Aff. ¶¶ 4-6.) RASCO approved twelve weeks of medical leave to run from

---

[1] It is unclear whether the evaluation was completed on May 10, 2004 or whether McNally and Esser met to discuss the evaluation on that date.

[2] Under the "recovery plan" plaintiff would be given thirty days to improve his sales performance. (Esser Aff. ¶ 7.) If there was no improvement, he would be placed on the "performance improvement plan," under which, his sales performance would be evaluated at regular intervals over several months to determine whether he was demonstrating any improvement. (Def. Rule 56.1 Stmt. ¶ 7.) The record does not indicate what further consequences could result from being placed under these various plans.

June 12, 2004 through September 4, 2004.  (Esser Dep. at 219-20; Esser Aff. ¶¶ 4, 5.)

When Esser and McNally met regarding the evaluation, Esser informed McNally of his medical leave.  (Esser Dep. at 219-20.)  Apparently, McNally did not know for certain that plaintiff would require this time off until this meeting.  (*Id.* at 219.)  Esser, having previously been placed on a recovery plan in 2002 for poor sales, *id.* at 215, was concerned that his sales performance would be evaluated during his FMLA leave.   (*Id.* at 220-21.)  On May 27, 2004, Esser met with John Oleynick, Vice President of Sales at RASCO, who allegedly stated that Esser's sales performance under the thirty day "recovery plan" would not be evaluated while he was on leave.[3]  (Esser Aff. ¶¶ 9, 10.)  On June 12, 2004, plaintiff began his FMLA leave.  (Def. Rule 56.1 Stmt. ¶ 13.)

On July 16, 2004, plaintiff attended an Elton John concert at Radio City Music Hall ("Radio City") with a friend, Brad Joblin.  (*Id.* ¶ 15.)  As an employee of Cablevision, Esser was entitled to discounted parking if he had his parking ticket validated at an employee entrance to Radio City; Esser and Joblin went to the 51st Street entrance for this reason.  (Esser Aff. ¶ 13.)  Esser presented his Cablevision identification card to the guard and asked if he could enter Radio City through the stage door.  (Esser Dep. at 58.)  The guard granted Esser permission to enter but would not allow Joblin to enter because he was not a Cablevision employee.  (*Id.*)  Joblin was somehow affiliated with Clear Channel Communications ("Clear Channel"), whose offices are located within Radio City and who served as a sponsor for the concert.  (*Id.* at 58-59; Esser Aff. ¶ 16.)  Esser asked if he could

---

[3] It is disputed what brought about this meeting.  Plaintiff asserts that Oleynick arranged the meeting to discuss comments plaintiff made in the employee comment section of his performance evaluation.  (Esser Aff. ¶¶ 8, 9.)  Defendant asserts that Oleynick arranged the meeting to allay plaintiff's concerns regarding his medical leave.  (Def. Rule 56.1 Stmt. ¶ 11.)  It is also disputed whether Oleynick appeared irritated at this meeting.  (Esser Aff. ¶¶ 10, 11; Def. Resp. 56.1 Stmt. ¶ 9.)

enter to obtain clearance from Clear Channel for Joblin to also enter through the stage door.  (Esser Aff. ¶ 16.)  It is disputed whether the guard permitted Esser to enter with the understanding that Esser was going only to Clear Channel's offices on the fourth floor and no where else in the building or whether the guard provided Esser unrestricted access.  (Def. Rule 56.1 Stmt. ¶¶ 21, 22; Pl. Rule 56.1 Stmt. ¶¶ 20, 25; Def. Resp. Rule 56.1 Stmt. ¶ 20; Esser Dep. at 73-74; Esser Aff. ¶¶ 16, 18, 19, 20.)  It is also disputed whether plaintiff was familiar with the backstage areas at Radio City and knew how to get to the Clear Channel offices.  (Pl. Rule 56.1 Stmt. ¶¶ 27, 28; Def. Resp. Rule 56.1 Stmt. ¶¶ 19, 20.)

Esser went to the Clear Channel offices but was unable to obtain authorization for Joblin. (Def. Rule 56.1 Stmt. ¶ 23.)  Esser returned to the elevator and attempted to find the way to his seat from the stage door entrance.  (Esser Aff. ¶ 22.)  He apparently used the restroom, asked for directions, again attempted unsuccessfully to locate his seat and eventually returned to the stage door where Joblin was waiting.  (*Id.* ¶¶ 24, 25.)  When Esser returned he and Joblin agreed to split up: Esser would enter through the stage door and Joblin through the public entrance.  They planned to meet at their seats "for convenience sake."  (*Id.* ¶ 26.)  This decision to split up was apparently based on the fact that since security had already permitted Esser to enter through the stage door, he could avoid missing any of the concert, which would result if he were forced to wait on the general admission line.  (*Id.*)  Plaintiff again approached the guard for permission to enter through the stage door entrance to take his seat and was again granted permission, *id.* ¶ 27, but he did not ask the guard for directions to his seat.  (Def. Rule 56.1 Stmt. ¶ 30.)  It is disputed whether the guard permitted Esser only to go to his seat or whether the guard gave no limiting instruction.  (Pl. Rule 56.1 Stmt. ¶ 35; Def. Resp. Rule 56.1 Stmt. ¶ 35.)

Plaintiff got back on the elevator and went to the third floor even though his seat was located on the stage level, one floor below. (Def. Rule 56.1 Stmt. ¶ 29.) Plaintiff claims that he mistakenly got on an elevator going up, and that it was so crowded that he got off at the first floor at which the elevator stopped which was the third floor. (Esser Aff. ¶ 28.) Elton John's hospitality suite was located on the third floor. (Def. Rule 56.1 Stmt. ¶ 34.) Plaintiff disclaims knowledge of this fact. (Esser Aff. ¶ 33.) According to plaintiff, he was on the third floor for only a short while and was never approached by a security officer. (*Id.* ¶ 30.) When he realized that he was on the wrong floor, he remained by the elevator waiting for the next available elevator, which he eventually took to the "ST" level, where he went to the bathroom before proceeding to his seat in the orchestra section. (*Id.* ¶¶ 29, 32, 34, 37.) He states that security guards never stopped him on his way to his seat. (*Id.* ¶ 40.)

Defendant claims that when Esser was on the third floor he was confronted by security officer Curtis Robinson who had been informed by another concert official that Esser did not belong in the area. (Def. Rule 56.1 Stmt. ¶¶ 37, 38.) Robinson then went to secure the door to Elton John's dressing room, and when he returned to speak to Esser, Esser was gone. (*Id.* ¶¶ 39-40.) Robinson radioed the security staff that an unidentified person was trespassing on the third floor. (*Id.* ¶ 41.) This message was apparently received by Anthony Ermillo, a security officer guarding the "wing door," who watched Esser go to his seat in the orchestra section and, with other officers, watched him throughout the concert. (*Id.* ¶¶ 43, 44.)

After the concert ended, Esser and Joblin exited through the public entrance and then returned to the stage door entrance on 51st Street for the stated purpose of locating the validated parking stub that Esser had lost. (Def. Rule 56.1 Stmt. ¶ 45; Esser Aff. ¶ 43.) Apparently, Esser was

followed out of the building by Security Supervisor Olga Mercado, and when plaintiff returned to the stage door, Mercado ordered that plaintiff be detained.  (Def. Rule 56.1 Stmt. ¶¶ 46, 47.) Mercado had apparently informed George Haskell, then-Vice President of Security for Radio City, of the incident that evening.  Haskell told Mercado to remove Esser from the building.  (*Id.* ¶¶ 48, 49.)  Plaintiff returned to the stage door, inquired about his validated parking ticket and was asked to present his concert ticket and identification.  (Esser Aff. ¶ 45.)  Plaintiff asserts that he provided these items, they were returned to him and he left Radio City without incident.  (*Id.* ¶¶ 45, 46.) Mercado, nevertheless, prepared an incident report.  (Def. Rule 56.1 Stmt. ¶ 50.)

On July 19, 2004, Haskell informed Paul Ryan, Director of Corporate Security at Cablevision, what happened at the concert because Esser was a Cablevision employee.  (*Id.* ¶ 53.) Ryan contacted  John Brian Gault, Executive Vice President of Local Advertising Sales at RASCO, who in turn called Oleynick and asked Oleynick to question Esser about the incident.  (*Id.* ¶¶ 54, 56.) Defendant asserts that Haskell and Gault did not at this point have any knowledge of plaintiff's medical leave.  (*Id.* ¶¶ 51, 55.)

Oleynick called Esser on July 19, 2004 and asked "What happened at the Elton John concert?"  (Esser Aff. ¶ 47.)  Esser told Oleynick that he was permitted to enter the backstage areas at Radio City through the stage door after his parking ticket had been validated, but his friend was not permitted to enter and that he had contact with security at the end of the evening.  (*Id.* ¶ 48.) Esser did not tell Oleynick that he had gone to the other floors.  (Def. Rule 56.1 Stmt. ¶ 59.)  Esser claims that he asked Oleynick why he was making this inquiry and Oleynick avoided answering, ending the phone call by stating that he had another call.  (Esser Aff. ¶ 49.)

Oleynick and Gault decided to terminate plaintiff based on the reports furnished by Radio

City and from what they determined to be Esser's "lack of candor during his telephone call with Mr. Oleynick." (Def. Rule 56.1 Stmt. ¶¶ 63-66.)  On July 26, 2004, Oleynick and Elena Ferrano, Employee Relations Manager at Cablevision, called Esser on a conference call to inform him that he was being terminated, but he did not answer the phone.  (*Id.* ¶ 67; Esser Aff. ¶ 50.)  Esser's answering machine apparently recorded the following conversation between Oleynick and Ferrano:

| | |
|---|---|
| Oleynick: | I got his answering machine. |
| Ferrano: | Oh. |
| Oleynick: | So, for a guy that's supposedly so hurt, its interesting he's not home. You know? |
| Ferrano: | Yeah.  Unless he's screening. |
| Oleynick: | Well, that's possible.  It's possible.  Possible. |
| Ferrano: | But he might have picked you up. |

(Def. Rule 56.1 Stmt. ¶ 67; Frumkin Decl., Ex. X.)

Esser called back and was informed of his termination.  (*Id.* ¶ 70.)  Esser inquired about the message left on his machine and Oleynick, in an apparent effort to avoid confrontation, informed Esser that he was referring to someone else.  (*Id.* ¶ 69.)  Defendant claims that they informed him that he was being terminated based on the information reported by Radio City.  (*Id.* ¶ 70.)  Plaintiff asserts that he was not given the reason for the termination until he applied for unemployment benefits.  (Esser Aff. ¶ 53.)  This action was commenced on April 11, 2005.

## DISCUSSION

### I.  <u>Motion for Summary Judgment Standard</u>

Under FED. R. CIV. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c)); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-50 (1986).  A fact is material only if, based

on that fact, a reasonable jury could find in favor of the nonmoving party.  *Anderson*, 477 U.S. at

248.  The burden rests on the movant to demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding whether summary judgment is

appropriate, the court resolves all ambiguities and draws all permissible factual inferences against

the movant.  *See Anderson*, 477 U.S. at 255.  To defeat summary judgment, the nonmovant must go

beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to

the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The court's role at this stage of the litigation is not to decide issues of material fact, but to discern

whether any exist.  *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir.

1994).


## II.    FMLA Claims

The FMLA grants to eligible employees the right to take up to twelve work weeks per year

of unpaid leave due to a serious health condition that prevents the employee from performing his

work function.  *See* 29 U.S.C. § 2612(a)(1).  Under the FMLA, at the end of the leave the employee

has the right to return to the position he or she had before or an equivalent position.  *See id.* §

2614(a). However this right is not absolute.  The employee has no right to be restored to the position

he or she held if the employee is unable to perform an essential function of the position because of

a physical or mental impairment.  *See Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155,

161 (2d Cir. 1999).  "The FMLA 'creates a private right of action to seek both equitable relief and

money damages against any employer (including a public agency) in any Federal or State court of

competent jurisdiction' should that employer 'interfere with, restrain, or deny the exercise of' FMLA

rights." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006) (citing *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 724-25 (2003)).

Under the FMLA, a plaintiff may raise separate causes of action for "interference" and "retaliation." *See Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004). For interference claims:

> a plaintiff need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her. She can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both . . . No scheme shifting the burden of production back and forth is required.

*Sista*, 445 F.3d at 175-76 (citing *Potenza*, 365 F.3d at 167 (internal citations omitted) (holding that plaintiff could not maintain a claim for either interference or retaliation because he could not demonstrate that defendant considered his FMLA leave a "negative factor" in its decision to terminate him). Retaliation claims, on the other hand, are to be analyzed under the *McDonell Douglas* burden-shifting analysis. *See Potenza*, 365 F.3d at 168 (recognizing two approaches for evaluating FMLA claims and applying the *McDonell Douglas* standard to retaliation claims).

## A.    <u>Interference Claim</u>

To establish a prima facie case for interference under the FMLA, a plaintiff must establish: "'(1) that she is an "eligible employee" under the FMLA; (2) that defendants constitute an employer under the FMLA; (3) that she was entitled to leave under the FMLA; (4) that she gave notice to defendants of her intention to take leave; and (5) that defendants denied her benefits to which she was entitled by the FMLA.'" *Kennebrew v. N.Y.C. Hous. Auth.*, No. 01 Civ. 1654, 2002 WL 265120, at *19 (S.D.N.Y. Feb. 26, 2002) (quoting *Santos v. Knitgoods Workers' Union*, No. 99 Civ. 1499, 1999 WL 397500, at *3 (S.D.N.Y. June 15, 1999)); *see also Sabatino v. Flik Int'l Corp.*, 286

8

F. Supp. 2d 327, 335-36 (S.D.N.Y. 2003) (Conner, J.)  Here, there is no dispute that plaintiff was given FMLA leave.  Therefore, plaintiff cannot satisfy the fifth element of an interference claim.


### B.   Retaliation Claim

Retaliation claims brought under the FMLA are examined under the three-step burden-shifting rules established by the Supreme Court in *McDonnell Douglas v. Green*.  411 U.S. 792 (1973); *accord Potenza*, 365 F.3d at 168.  Under this analysis, the plaintiff must first establish a prima facie case of discrimination.  If the plaintiff establishes a prima facie case, a presumption that the employer unlawfully discriminated against the plaintiff is raised and the burden of production then shifts to the employer to "articulate a legitimate, clear, specific and non-discriminatory reason" for its actions.  *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995).  The employer's burden is "merely one of production, not persuasion; it can involve no credibility assessment."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).  If the employer satisfies that burden, the presumption of discrimination drops out and the plaintiff has the burden to establish by a preponderance of the evidence that the employer's stated reason was merely a pretext for discrimination.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).  In addition, the plaintiff must submit evidence that would permit a rational factfinder to infer that the discharge was actually motivated, in whole or in part, by discrimination.  *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 561 (2d Cir. 1997). "[T]he plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors."  *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995).

The Second Circuit has determined that in order to raise a prima facie case retaliation claim under the FMLA, a plaintiff "must establish that: 1) he exercised rights protected under FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an interference of retaliatory intent." *Id.* The parties appear to dispute only whether plaintiff can meet the fourth element of his prima facie case. Plaintiff claims that defendant demonstrated animus toward plaintiff and failed to investigate the allegations against plaintiff as throughly as they would have in other instances. This is sufficient to raise an issue of fact as to whether plaintiff's FMLA leave was a negative factor in terminating plaintiff.

Defendant argues that the reason for plaintiff's termination was based on the breach of security that occurred at the Elton John concert. Indeed, defendant has provided evidence that plaintiff used his employee identification to obtain access to restricted areas of the concert and an investigation was performed which revealed such. In addition, according to defendant, plaintiff was not completely honest regarding the events at the Elton John concert and was a sufficient basis for terminating him independently of his FMLA leave.

"[O]nce a minimal prima facie case is proved and the employer's nondiscriminatory explanation has been given, the *McDonnell Douglas* presumptions disappear from the case, and the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000). Here a reasonable factfinder could determine that defendant exhibited animus toward plaintiff for taking FMLA leave.

Plaintiff asserts that the facts, viewed in the light most favorable to him, demonstrate that the

10

defendant's termination was motivated by plaintiff's exercise of his rights to take leave under the FMLA. (Pl. Mem. Opp. Mot. Summ. J. at 4.) Specifically, plaintiff asserts that Oleynick, plaintiff's supervisor, exhibited animus towards him prior to his taking FMLA leave by appearing "irritated" at their initial meeting, refusing to shake plaintiff's hand after the meeting and for stating on plaintiff's answering machine "for a guy that's supposedly so hurt, its interesting he's not home." (*Id.* at 3-5.) These comments alone permit an inference of the necessary causal relationship.

Throughout his papers, plaintiff heavily relies on Oleynick's supposed "irritation" at his meeting with plaintiff regarding FMLA leave and his refusal to shake plaintiff's hand at the close of that meeting. Apparently, plaintiff's comments with respect to "section G" of his performance appraisal indicated that he was concerned that the company would use his FMLA leave as a negative factor in evaluating his sales performance and this was how Oleynick learned that plaintiff was taking FMLA leave. (Oleynick Dep. at 58; *see* Pl. Mem. Opp. Mot. Summ. J. at 4.) However, Oleynick testified that he never questioned the validity or length of the leave. (Oleynick Dep. at 60.) Oleynick's testimony regarding the "irritation" was that in his comments, plaintiff attempted to explain his poor performance by relying on incidents that occurred in 2001. (*Id.* at 78-79.) Oleynick stated, "speaking . . . about a event that happened three years ago in the sales world, that might as well have been 300 years ago. I was a little irritated that the, if you will, reasons that were stated here, again resort back to events that happened almost fully three years prior." (*Id.*) Indeed, the first two paragraphs of plaintiff's comments in section G of his performance appraisal concerned his dissatisfaction at not being promoted to "Senior Account Executive" based on his performance prior to 2001 and offer an explanation for his unsatisfactory performance since 2001. (Frumkin Decl., Ex. Z.) Whether Oleynick was in fact irritated during this meeting and whether that irritation indicates

11

animus toward plaintiff for taking FMLA leave are issues of fact improper for summary judgment.

In addition, plaintiff focuses on Oleynick's failure to shake plaintiff's hand at the end of this meeting as further indication of defendant's animus toward plaintiff.  Oleynick testified that he did not shake plaintiff's hand because plaintiff told Oleynick that "his hands were both in severe pain" and he was having surgery soon for carpal tunnel syndrome.  (Oleynick Dep. at 85-86.)  He further stated that he thought that Esser's concern regarding how the FMLA leave would impact Esser's recovery period was legitimate. (*Id.* at 86.)  Oleynick also stated that Esser thanked him for the meeting and  indicated that it had been productive.  (*Id.*)  Oleynick "wished him well" and told him "I hope everything turns out well with your surgery."  (*Id.*)  While this does not appear to indicate animus, that is ultimately a decision for a jury to decide after hearing the witnesses testify.

Plaintiff also directs the Court to testimony of Oleynick which indicates that, with respect to terminating other employees, they were provided an opportunity to meet with him and discuss the allegations against them before they were terminated.  (*Id.* at 13-20.)  Plaintiff has repeatedly argued that defendant deviated from its policy regarding pre-termination investigation and that this is indicative of an improper motive.  Indeed, a factual issue whether defendant had deviated from an established policy would defeat summary judgment.  *See Ferrell v. Leake & Watts Servs., Inc.*, 83 F. App'x 342, 347 (2d Cir. 2003) (finding that "whether these departures [from established procedures] had an impact on [plaintiff's] dismissal is a question of fact for trial"); *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997) ("While we do not second-guess an employer's hiring standards, the reasons for its employment decision . . . are subject to scrutiny under Title VII, and '[d]epartures from procedural regularity,' for example, 'can raise a question as to the good faith of the process where the departure may reasonably affect the decision.'" (quoting *Zahorik v. Cornell*

12

*Univ.*, 729 F.2d 85, 93 (2d Cir. 1984)).

Oleynick testified that he never received training in conducting investigations of employee misconduct and that he did not know if there was any such training offered at Cablevision. (Oleynick Dep. at 23.)   In addition, he testified that he had never seen any written policy for Cablevision regarding employee misconduct nor did he know if any such policy existed.  (*Id.*) Indeed, it is unclear whether Cablevision has an informal, unwritten policy and, if so, what its terms provide.[4]  (Ferraro Dep. at 72-73.)  Oleynick stated that, with respect to having to fire other employees, when he "felt that this was going to lead to termination . . . I would have to meet with the employee." (Oleynick Dep. at 20-21.)  He further testified that he felt this was necessary so that the employee would have an opportunity to explain his or her side of the story before being terminated.  (*Id.*)  Here, plaintiff, who was absent because of FMLA leave, was called and asked what happened at the concert.  While it appears that plaintiff had the opportunity to explain his position and failed to do so, we cannot say, as a matter of law, that Cablevision did not have an informal policy regarding termination of employees and that it did or did not follow such a policy with respect to Esser.  Such determinations must be made by a jury.  Therefore, summary judgment is inappropriate.

**CONCLUSION**

For all of the foregoing reasons, the motion for summary judgment of defendant Rainbow Advertising Sales Corp. d/b/a Cablevision Advertising Sales is granted as to the interference claim

---

[4] We assume that there is no formal, written policy as neither party has provide the Court with a copy and, if one existed, we presume this would have been produced during discovery.

and denied as to the retaliation claim.


SO ORDERED.

Dated:  White Plains, New York
        September 13, 2006

                                          *William C. Conner*
                                   Sr. United States District Judge

14